IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| John D. West, on Behalf of Himself and All Other Persons Similarly Situated,<br>       Plaintiffs,<br><br>  v.<br><br>AK Steel Corporation, etc., et al.<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. C-1-02 0001<br><br>District Judge Sandra S. Beckwith<br><br>**Affidavit of Michael L. Libman** |

State of Ohio      :
          :  SS
County of Cuyahoga   :

1. Michael L. Libman, first duly being cautioned and thereafter being sworn according to law, deposes and states as follows.

2. My qualifications to serve as an expert in these proceedings – on matters relating to the AK Steel Corporation Retirement Accumulation Pension Plan, a part of the AK Steel Corporation Noncontributory Pension Plan (hence, the "Plan"), payments made thereunder, and payments still due pursuant to this Court's Order in these proceedings of April 8, 2004 – were addressed and explored by defense counsel during my depositions in this action on October 30, 2002, and August 31, 2004. I understand that the defendants did not enter an objection to my expert qualifications in any of their submissions relative to the parties' earlier cross-motions for summary judgment on matters attendant to the liability issues in this suit. Accordingly, here I only report briefly on the more relevant aspects of my professional expertise and my qualifications as an expert by knowledge, skill, experience, training, and education:

  **Actuarial Societies and Memberships**
    Associate, Society of Actuaries (1970)
    Member, American Academy of Actuaries (1971)
    Enrolled Actuary (1979)

    Member, American Society of Pension Actuaries (1996)
    Fellow, Conference of Consulting Actuaries (2000)

**Employment**
    Libman, Ryder & Company, Inc. Cleveland OH    Effective 1/1/90
        Consulting Actuary- over 300 clients primarily in Ohio, including 6 law firms; responsible for creative consulting and research.
    Foster Higgins and predecessors Cleveland OH    1975-1989
        Consulting Actuary- over 250 plans from 1 to 6,000 participants. Senior actuary with responsibilities for managing the actuarial practice and business development.
    Mutual of New York New York NY    1963-1974
        Assistant Actuarial Director- financial projection, corporate modeling and many other actuarial assignments
    U.S. Army    1966-1968
        Served as an actuary in the Department of Defense (OASD-M&RA)

**Professional Educational Activities**
    Enrolled Actuaries Meetings- panelist and/or lecturer 1984, 1993, 1994
        1993: Coverage Rules of IRC Section 410(b)
        1994: Coverage Rules of IRC Section 410(b)
    Akron University Law School- guest lecturer 1990-91
    Case Western Reserve University Law School- guest lecturer 1992-93
    Society of Actuaries- Part 150 Exam Committee 1986-1991
    Numerous speaking engagements 1977-2001

**Publications**
    Young, <u>Pension and Profit-Sharing Plans</u>

**Depositions**
    *Steve H. Grosserode V. C.P.I. Qualified Plan Consultants Inc.* (as expert)
    Several other cases (1995-2002)

**Education**
    BS in mathematics, St. Lawrence University 1963


3.    I was requested to provide my expert opinion regarding a proper determination of underpayment calculations in this lawsuit. For such purposes, I was provided materials, such as documents pertinent to the Plan, data from the Plan (provided by defense counsel both by Excel spreadsheets and in hard copy), and Judge Beckwith's Order in this action of

April 8, 2004. I was asked to provide the best current calculation of (1) the amounts due each defense-identified class member as of the date of each member's initial lump-sum distribution from the Plan, (2) to increase each such principal amount, by interest at different rates of interest, from the date of each member's initial lump-sum distribution through December 31, 2004, and then (3) to sum and report such results. I have done as was requested, and I report the results herein.

4.   I reported on my initial efforts at calculating the aforementioned results in a report dated July 12, 2004. After that report was issued, I discovered that, in transferring the defendants' data for purposes of my calculations, I had made a formula error that had affected the results for two class members. I corrected that error, and issued a supplemental report on August 18, 2004. Incident to our further review of the data, I confirmed that there was one further adjustment in the data's handling incident to the calculations for a third class member. The results reported in this Affidavit were reached after making the aforementioned corrections. Upon further review of all of the data and the computations therewith, and all of the comments that defense counsel shared with me relative to that data and those computations, I am confident in concluding that I have identified and corrected every calculation-related difference between the methodologies that produce the results reported herein and the alternatives to one or two such methodologies that defendants may espouse.

5.   In calculating the class' underpayments, I determined each class member's projected age-65 account and annuity separately for the member's opening and future accounts. The defendants' expert, Lawrence Sher, in his report dated August 27, 2004, concurred "[t]hat separate treatment was necessary under the terms of the AK Steel plan because of the special 7.5% interest rate that applies with respect to the opening balance account." Mr. Sher then pointed out that, after I had separately determined the two accounts' respective annuities and then determined the lump sums attributable to each such annuity, I compared each account's lump sum amount to the amount paid to the class member from

that account, and then summed the differences (treating negatives as zeroes) to determine the class member's underpayment. Mr. Sher suggested that "[a]n alternative approach would be to take the total projected age 65 annuity, find its lump sum value at the original lump sum payment date and subtract from that result the total original lump sum paid." Mr. Sher noted that the Plan did not require the approach that I pursued, and I note that the Plan does not require the alternative approach that Mr. Sher suggested. However, inasmuch as the practical difference between the two approaches are *de minimis*, I have decided to adopt Mr. Sher's approach, and to calculate each class member's underpayment in a consolidated fashion with respect to the member's opening and future accounts.

6. Presented herewith, marked as Exhibit 1, is a table, which summarizes the results of my calculations. The calculations for the results that are summarized on Exhibit 1, and are more fully shown on the two accompanying rosters, are fully shown in Exhibits 2 and 3. A description of those Exhibits follows:

> Reviewing Exhibit 2, the top section details participant data. The participant Name, Date of Birth, Normal Retirement Date, Lump Sum Date, Calculation Date, and Total Prior Lump Sum Actually Paid are listed.
>
> Section A of Exhibit 2 details the calculation for the Opening Account using the Account Balance per Plan records (A1) at the Lump Sum Date. This Lump Sum benefit is then projected to Normal Retirement Date (A3) using Plan interest (A2) per the plan document Article 3.3. The projected Account Balance is converted into a straight life annuity benefit (A6) using Plan interest (A4) and Plan mortality (1971 Group Annuity Mortality, male rates, projected to 1978 with scale E) as specified by the plan document in Exhibit 1(A).
>
> Section B of Exhibit 2 details the calculation for the Future Account using the Account Balance per Plan records (B1) at the Lump Sum Date. This Lump Sum benefit is then projected to Normal Retirement Date (B3) using Plan interest (B2) per the plan document Article 3.3. The projected Account Balance is converted into a straight life annuity benefit (B6) using Plan interest (B4) and Plan mortality (1971 Group Annuity Mortality, male rates, projected to 1978 with scale E) as specified by the plan document in Exhibit 1(A).

Section C of Exhibit 2 determines the 417(e) Lump Sum. First, the two annual annuity amounts are added from (A6) and (B6) to obtain a total Annual Annuity (C1) at Normal Retirement Date. The correct 417(e) interest rate (C2) from Exhibit 3 is determined and used with the 417(e) Mortality Table described on Exhibit 3 to calculate the 417(e) Maturity Value for Straight Life Annuity Conversion (C3). The product of (C1) and (C3) divided by twelve is the Lump Sum at Normal Retirement Date (C4). The resulting amount is converted into a Present Value at Lump Sum Date (C5).

The resulting amount shown under (C5) is discounted by interest only, since the Plan provides a death benefit equal to the sum of the Opening Account Balance plus the Future Account Balance, each calculated as of the participant's date of death, there is no material gain to the Plan or loss to the participant due to the participant's death should that event occur. That is, Exhibit 2 shows the calculations without factoring into the computations the AK Steel Plan's nonexistent gain when a class member dies before reaching the age of 65. That issue – whether to use a pre-age-65 mortality factor in computing the retirees' additionally owed amount – is fully discussed later in this Affidavit.

Section D of Exhibit 2 calculates the Underpayment due to this participant. The 417(e) Lump Sum amount (D1) is copied from (C5). Then, the Lump Sum actually paid (D2) is subtracted to obtain the Difference (D3), or the Underpayment as of the Lump Sum Date. In no case will the Difference be less than zero.

The interest rates used for the calculations that are shown in Exhibit 2 vary for participants based on the year of the Lump Sum distribution. The attached Exhibit 3 lists the interest rates by year as provided by defendants.

7. Also presented herewith are two rosters, marked Exhibits 4 and 5, each of which identifies by name each of the 1,257 class members thus far identified by the defendants, and specifies for each member:

> ➢ The date on which the class member received their retirement benefits in the form that the retiree had specified – an immediate lump-sum payment;
>
> ➢ The amount of that original lump-sum payment; and
>
> ➢ The additional amount that should have been paid the retiree on the date that the member had received the original lump-sum payment, as determined pursuant to Judge Beckwith's April 8, 2004 Order, and the

proper application of widely accepted pension actuarial principles to such legal directives.

8.  Both rosters then extend the calculations for each of the 1,257 class members thus far identified, to account for the time-value of money with interest in order to provide a whole picture of each class member's actually incurred underpayment. Thus, the additional amount owed is extended in the rosters for each class member, by three alternative methods:

- ➢ The first extension applies the rate of interest proscribed by Section 1343.03(A) of the Ohio Revised Code, of 10% per annum simple interest through June 1, 2004, and 4% per annum simple interest thereafter, and then sums the additional amount owed as of the original lump-sum payment's date and the interest thereon through 2004;

- ➢ The second extension applies the Plan's own minimum Interest Credit Percentage of 7.5% for Opening Accounts and compounds monthly pursuant to Section 3.3 of the Plan, and then shows the sum of such interest and the additional amount that was owed as of the original payment's date; and

- ➢ The third extension applies the rate of interest that was in effect under Section 1961 of Title 28 of the United States Code as of the date of the member's original lump-sum payment (such rates are published at <http://www.federalreserve.gov/releases/H15/data/wf/tcm1y.txt>), computed daily and compounded annually as called for by Section 1961, and then reports the sum of such interest added to the amount owed as of the original lump-sum's date.

As an alternative to any of these base rates, the retiree could be provided the Plan's actual rate of return on investments, from the date of the retiree's original lump sum payment, whenever the Plan's return is greater than the base rate.

9.  The first roster, marked Exhibit 4, is sub-titled "Present Value through 2004 of the Retirement Benefits Owed 1,257 Class Members in the *West v. AK Steel* Class Action, Without Pre-Age-65 Mortality Factored." As that title suggests, the results reported in the first roster are calculated without factoring into the computations the AK Steel Plan's nonexistent

gain when a class member dies before reaching the age of 65. There are good and valid actuarial reasons why, in these computations, that factor should not be included, and for such reasons I advocate against using a pre-age-65 factor in these computations.

10. A pre-age-65 factor is used when there is a legitimate reason to account for the gain that a pension plan participant may have upon a plan participant dying before age 65. No such reason exists with respect to the AK Steel Plan's payment of lump-sum benefits because the Plan provides a death benefit equal to the sum of the Opening Account Balance plus the Future Account Balance, each calculated as of the participant's date of death. Thus, whether or not a participant dies before age 65 is of no matter to what the Plan pays, and there is no material gain to the Plan or loss to the participant due to the participant's death should that event occur prior to the participant obtaining an annuity at age 65.

11. Though I am of the opinion that a pre-age-65 mortality factor has no proper place in these calculations, I have been requested to report my results with that factor. Accordingly, the second roster, marked Exhibit 5 and subtitled "Present Value through 2004 of the Retirement Benefits Owed 1,257 Class Members in the *West v. AK Steel* Class Action, <u>With</u> Pre-Age-65 Mortality Factored," also accompanies this Affidavit.

12. Exhibit 1 summarizes the individual, by-class-member, results that are shown within the two rosters. As shown on Exhibit 1, without accounting for the Plan's nonexistent gain at a class member dying before age 65, the sum of the 1,257 thus-far-identified class members' underpayments through 2004 are $56,138,039.07 at the Ohio statutory rate of interest for the members' lost time-value-of-money, $55,499,929.99 at the Plan's 7.5% rate, and $49,774,687.26 at the federal rate of interest. Exhibit 1 also shows that, if one were to factor pre-age-65 mortality into the calculations, the sum of the identified class members' underpayments through 2004 would be $45,917,024.06 at the Ohio statutory rate of interest for the members' lost -time-value-of-money, $45,386,811.81 at the Plan's 7.5% rate, and $40,713,622.56 at the federal rate of interest.

13. Thus far in this Affidavit, I have addressed two of the alternative calculation methods that the defendants' expert, Mr. Sher, has suggested. For the reasons I have given above, I decided to concur in Mr. Sher's "consolidation" approach for determining each class member's additionally owed amount as of the time of the original lump-sum's payment, but I must reject his suggestion to use a pre-age-65 mortality discount where none exists under the terms of the Plan. The law as I understand it and employ it in pension actuarial work dictates that there be no such discount with a plan such as the AK Steel Plan.

14. A third alternative that Mr. Sher suggested would have us use, for projecting each class member's account balances to age 65, the very same rates that are to be used in bringing those projected values to a present value, thus producing no difference owed the class member on that account. That approach is contrary to the approach required, in calculations such as those contemplated by Judge Beckwith's April 8, 2004 Order, by I.R.S. Notice 96-8, and was specifically rejected by Judge Beckwith at footnote 12 of her Order.

15. Finally, Mr. Sher suggested that the amount owed each class member should be paid in the form of an annuity commencing at age 65 (an age that 80% of the class has not yet reached). Adoption of this alternative would be contrary to the election that each class member made – to take retirement benefits in a lump-sum payment at retirement – and, I believe, would be a violation of ERISA and the tax code. Moreover, though a lump-sum payment is to be the actuarial equivalent of an age-65 annuity, there are many good and practical reasons why a retiree would not in effect invest his retirement benefits in an American steel-making corporation.

16. A few caveats properly apply to the results on which I report herein. In the first instance, the accuracy of my results is limited by the accuracy of the data that the defendants have supplied. For example, I have received at least two corrective installments of data from the defendants, in one instance providing corrected data for 51 class members and in the other instance belatedly providing data on a member who retired back in 1995.

Also, I have not been provided data for any class member who retired after August 1, 2004. Accordingly, the results reported herein may be affected as the defendants make further disclosures of retirement data, or corrections to data previously provided.

17. In closing, I state that I am an adult competent to testify in these proceedings, that everything which is stated herein upon my personal knowledge thereof is true, and that as for that which is stated herein other than on my personal knowledge thereof I verily believe to be true. Further, the opinions which are set forth herein and in the attached three Exhibits as well as in the accompanying two rosters (all of which is incorporated into this Affidavit as if fully rewritten here) are only those opinions which I hold to a reasonable degree of certainty applicable to the field of pension actuarial work, are based upon facts and data sufficient to fully support said opinions, and are the products of reliable principles and methods, reliably applied to such facts and data. The results, which I report herein, are based on reliable, widely accepted practices and information regularly within the ambit of pension actuaries. The theories upon which such results are based are objectively verifiable and are validly derived from widely accepted knowledge, facts or principles in the field of pension actuarial work, the design of procedures for reaching such results reliably implements such theories, and, with respect to the particular results reported below, were regularly conducted in such a way that yielded accurate results.

_____
Michael L. Libman

State of Ohio           :
                        :   SS
County of Cuyahoga      :

Sworn to and subscribed before me, a Notary Public in and for said State and County, by a person known to me to be Michael L. Libman, this 12th day of October, 2004.

_____
Notary Public

SUSAN M. MALLOCH
NOTARY PUBLIC, STATE OF OHIO, CUYA. CTY.
MY COMMISSION EXPIRES MARCH 6, 2006