# REPORT

# OF

# LAWRENCE SHER

John D. West, on Behalf of Himself and All other Persons Similarly Situated
vs.
AK Steel Corporation Retirement Accumulation Pension Plan, et al.

Case 1:02cv0001

United States District Court
Southern District of Ohio
Western Division

## I.     Background

I am a Principal and the Chief Actuary of the Retirement Practice at Mellon Consultants, Inc., an actuarial and employee benefits consulting firm owned by Mellon Financial Corporation. I am a Fellow of the Society of Actuaries and have practiced as an actuary since 1973. I practice primarily in the area of pension benefits. I have extensive experience designing and consulting with respect to defined benefit pension plans, including cash balance plans. In the past fourteen years I have devoted a significant portion of my time to issues relating to cash balance plans, including providing technical assistance and advice to my firms' consultants, clients and to government officials, initiating and supervising research activities, speaking at professional conferences, publishing articles, and responding to questions from the media. A more detailed outline of my background is included in the Appendix.

Over the past four years, I have provided expert testimony at trial or by deposition in the following cases:

   Lyons v. Georgia Pacific Corporation; U.S. District Court for the Northern District of Georgia Atlanta Division; Civil Action File No. 1:97-CV-0980-JOF.

   Berger et al. v. Nazemetz et al.; U.S. District Court for the Southern District of Illinois; No. 00-584-DRH.

   Cooper et al. v. IBM Personal Pension Plan and the IBM Corporation; U.S. District Court for the Southern District of Illinois; No. 99-829-GPM.

   Janice C. Amara, et al. v. CIGNA Corp. and CIGNA Pension Plan; U.S. District Court for the District of Connecticut; 3:01-CV-2361 (DJS).

   Phillip C. Engers, et al. v. AT&T and AT&T management Pension Plan; U.S. District Court for the District of New Jersey; Civil Action No. 98-CV-3660 (JLL)

Counsel for the defendants asked me to provide an analysis of the potential damages arising from the April 8, 2004 Order in West v. AK Steel Corporation ("District Court decision"). Specifically, I was asked to review the report of plaintiffs' expert, Michael Libman, attempt to replicate his damages calculations, and make observations on his calculations.

My firm is being compensated for my time at my customary hourly rate (currently $660) and for others who assist me at their customary hourly rates, plus out-of-pocket expenses.

In preparing this report, I reviewed the following material:

- July 12, 2004 letter from Michael Libman to Thomas Theado at Gary, Naegele & Theado ("Libman report")

- Armco Inc. Retirement Accumulation Pension Plan, Effective January 1, 1995 and as Further Amended Effective July 1, 1995 ("AK Steel plan")

- District Court decision, and data on class members needed for damages calculations

- Formulas used by the AK Steel plan actuary to calculate potential damages amounts using Mr. Libman's and other approaches

- Revised Libman damages calculation for two class members – ███ and ███, labeled Exhibits II(c) and II(d), respectively

## II.   Mr. Libman's Calculations

On page 32 of Exhibit I of the Libman report, the total damages, not including pre-judgment interest, were shown to be $39,335,989. Defendants' counsel informed me that the Court would determine the pre-judgment interest rate, if any, which applies in this case. I have performed all of my calculations in this Report without any pre-judgment interest. Interest can be added to my calculations once the Court determines the rate.

Based on the data received on class members and the methodology details provided in the Libman report, I attempted to replicate the individual calculations leading to that total amount. For all but three class members (███, ███ and ███) I was able to replicate or come very close to replicating Mr. Libman's results (before pre-judgment interest). Mr. Libman subsequently revised his calculations for ███ and ███ resulting in revised total damages (before pre-judgment interest) under Mr. Libman's methodology of $39,307,445.

A material difference now remains with respect to only one person, ███. The difference arises in the calculations for ███ because he apparently was paid a lump sum that exceeded his account balance and $███ was subsequently repaid to the plan. Mr. Libman's calculations determine damages on the original lump sum. My calculations, reflecting the net (i.e., original lump sum less repaid amount) reduce Mr. Libman's damages with respect to ███ by $███ (not reflecting pre-judgment interest).

Exhibit 1 sets forth my calculations for ███ (using Mr. Libman's methodology) in comparison with Mr. Libman's calculations.

2

### III. Observations on Mr. Libman's Calculations

I have comments on four aspects of Mr. Libman's damages calculations:

- Mr. Libman's determination of damages separately with respect to opening and future service accounts ("segregation issue")

- Mr. Libman's assumption that no employees would die before reaching age 65 ("pre-age 65 mortality issue")

- Mr. Libman's presentation of damages in the form of lump sum payments rather than as annuities ("form of payment issue")

- Mr. Libman's methodology for projecting interest to age 65 ("interest credit projection issue")

The following discusses these four issues.

#### 1. Segregation Issue

In calculating damages, Mr. Libman determined each class member's projected age 65 account and annuity separately with respect to the opening balance and future service portions. That separate treatment was necessary under the terms of the AK Steel plan because of the special 7.5% interest rate that applies with respect to the opening balance account.

Mr. Libman proceeded to determine the lump sum separately attributable to the two annuities derived from the class member's projected opening balance account and the projected future service account. Mr. Libman then added together the separately determined excess, if any, of the recalculated amounts over the corresponding original lump sum amounts.

An alternative approach would be to take the total projected age 65 annuity, find its lump sum value at the original lump sum payment date and subtract from that result the total original lump sum paid.

The consequence of Mr. Libman's "segregated" approach is that damages for some employees are higher than otherwise would be the case under the alternative "consolidated" approach. Exhibit 2 illustrates the two approaches for a class member, ████████, for whom the segregated approach produces higher damages than the consolidated approach.

3

I did not find any requirement in the AK Steel plan to use a segregation approach once the age 65 annuities are determined. The employee is entitled to a total age 65 annuity, and plan section 6.6(e) does not permit the election of different forms of payment with respect to the opening balance and future service accounts. Mr. Libman did not provide an explanation as to why he determined damages in that way.

2. **Pre-Age 65 Mortality Issue**

After determining the projected age 65 annuities attributable to the class member's account balance, Mr. Libman applied some, but not all, of the assumptions applicable under IRC section 417(e) to determine the re-calculated lump sum values. Mr. Libman used the applicable interest rates under section 417(e) to "discount" future annuity payments backward in time from the date each annuity payment is scheduled to be made to the date the account balance was paid to the class member.

Mr. Libman also included the section 417(e) applicable mortality rates – to take into account the probability that the class member will survive to each projected annuity payment date – but only at ages 65 and over. The IRS published section 417(e) applicable mortality tables in Revenue Rulings 95-6 and 2001-62. The 1995 Ruling showed mortality rates at ages 5 through 110, and the 2001 Ruling at ages 1 through 120. By disregarding mortality rates before age 65, Mr. Libman assumed that there was no chance that the employee would die before reaching age 65, contrary to the assumptions in the Revenue Rulings.

Mr. Libman provided an explanation as to why he did not reflect mortality rates before age 65. He said that the lump sum derived at age 65 is discounted to the class member's original lump sum payment date by interest only for the following reason: "since the Plan provides a death benefit equal to the sum of the Opening Account Balance plus the Future Service Account Balance, each calculated as of the participant's date of death, there is no material gain to the Plan or loss to the participant due to the participant's death should that event occur."

Mr. Libman's explanation acknowledges that his damage calculations include not only the present value of the projected age 65 annuities, but also the present value of the death benefits the AK Steel plan provides in the event of the class member's death before age 65. It is my understanding that only *vested accrued benefits* are subject to the minimum lump sum rules. It is also my understanding that pre-retirement death benefits are not considered vested accrued benefits under the law and IRS regulations. Rather they are described as

4

"ancillary" or "incidental" benefits that need not be included in lump sum distributions in order to satisfy the minimum cash out rules.

The consequence of Mr. Libman's assumption that all employees will survive until age 65 is that damages for employees under age 65 on the lump sum dates are higher than otherwise would be the case had mortality assumptions been used at all ages both before and after 65.

3. **Form of Payment Issue**

   Mr. Libman determined damages on the presumption that they would be paid to class members in the form of additional lump sum distributions. As currently written, the AK Steel plan generally provides that the payment of a lump sum equal to the employee's current account balance will relieve the plan from any further obligation to the employee. Therefore, to the extent that there is a residual obligation to an employee who received such a lump sum, the plan will have to be amended to indicate how the residual benefits are to be distributed. One possibility would be for the AK Steel plan to be amended to permit or require that the additional benefits be paid in the form of supplemental age 65 annuities rather than supplemental lump sum payments.

   This supplemental annuity approach is commonly used in defined benefit plans that allow partial lump sum distributions – e.g., where the plan allows employees to take back their own contributions to the plan in a lump sum and pay the remainder of the benefit in an annuity.

4. **Interest Credit Projection Issue**

   I note that Mr. Libman determined the interest credit projection rate using one of the methods discussed in Footnote 12 of the District Court decision. Defendants' counsel requested that I run damages calculations both reflecting that approach and under the approach discussed in Footnote 12 that the Defendants advocated.

## IV.   Revised Calculations

Exhibit 3 provides revised calculations, as follows:

1. **Eliminating Segregation**

   Column 4 on Exhibit 3 shows the results of my damages calculations following Mr. Libman's methodology except that once the age 65 annuities are determined with respect to the opening and future service accounts, they are combined and the remainder of the calculations are determined using the total age 65 annuities.

5

This approach results in total damages of $38,957,800, which is $349,645 lower than Mr. Libman's revised total (not reflecting pre-judgment interest, if any).

2. **Reflecting Pre-Age 65 Mortality**

   Column 5 on Exhibit 3 introduces the same applicable mortality rates under IRC section 417(e) at ages below age 65 that Mr. Libman used after age 65. The combined effect of these changes to Mr. Libman's methodology (elimination of segregation and fully reflecting mortality) results in damages of $31,884,208, which is $7,423,237 lower than Mr. Libman's revised totals (not reflecting pre-judgment interest, if any).

3. **Damages in the Form of Age 65 Annuities**

   Also on Exhibit 3 are the supplemental annuities that would eliminate any forfeitures that arise under the District Court decision. I have determined such annuities by taking the age 65 annuities that would have been payable under the Libman methodology had the class members not received any lump sum payments, and subtracting the annuities actuarially equivalent to the lump sum payments actually received (with actuarial equivalencies determined using the applicable IRC section 417(e) assumptions). Column 6 shows the supplemental annuities calculated assuming no mortality rates before age 65, and Column 7 shows the supplemental annuities reflecting mortality both before and after age 65.

4. **Damages Reflecting Alternative Interest Credit Projection**

   Mr. Libman's damages calculations and my calculations shown in Exhibit 3 all project interest credits from the class member's original lump sum date to age 65 using the AK Steel plan's interest crediting rates applicable in the year the lump sum was paid. Exhibit 4 repeats the Exhibit 3 calculations using an alternative approach for projecting interest. Under that approach, interest is projected using the generally applicable interest rate under the plan's definition of "actuarial equivalent" – i.e., the annual rate of 30-year Treasury securities for the November preceding the year the lump sum was paid.

Exhibit 5A shows the details of my damages calculations with respect to ▓▓▓▓, applying the interest credit projection approach used by Mr. Libman. Exhibit 5B repeats those calculations but using the alternative interest credit projection approach advocated by the Defendants.

August 27, 2004                            Lawrence J. Sher, F.S.A.

6