*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN D. WEST, on behalf of himself and all others
similarly situated,

                          *Plaintiff-Appellee,*

    *v.*

AK STEEL CORPORATION (formerly Armco Inc.)
RETIREMENT ACCUMULATION PENSION PLAN and
AK STEEL CORPORATION BENEFIT PLANS
ADMINISTRATIVE COMMITTEE,

                          *Defendants-Appellants.*

No. 06-3442

**FOR YOUR INFORMATION**

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00001—Sandra S. Beckwith, Chief District Judge.

Argued: March 16, 2007

Decided and Filed: April 20, 2007

Before: COLE, CLAY, and GILMAN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Robert D. Wick, COVINGTON & BURLING, Washington, D.C., for Appellants.
Thomas A. Downie, GARY, NAEGELE & THEADO, Cleveland, Ohio, for Appellee. **ON BRIEF:**
Robert D. Wick, COVINGTON & BURLING, Washington, D.C., for Appellants.  Thomas A.
Downie, GARY, NAEGELE & THEADO, Cleveland, Ohio, Thomas R. Theado, Jori B. Naegele,
Robert D. Gary, GARY, NAEGELE & THEADO, Lorain, Ohio, Allen C. Engerman, Northbrook,
Illinois, for Appellee.

---

### OPINION

---

    RONALD LEE GILMAN, Circuit Judge.  This is a class action lawsuit brought by early
retirees in the AK Steel Corporation Retirement Accumulation Pension Plan (AK Steel Plan) who
elected to receive their pension benefits under the Plan in the form of a lump-sum payment. The AK
Steel Plan is a cash balance plan specifying that participants can elect to receive a lump sum equal
to their "account balance" at the termination of employment rather than having to wait until they
reach the normal retirement age of 65. According to the plaintiffs, the AK Steel Plan's failure to use

what is known as the "whipsaw calculation" when determining the value of the lump-sum distributions for these early retirees caused a forfeiture of benefits in violation of the Employment Retirement Income Security Act (ERISA).

The district court, in April of 2004, granted partial summary judgment in favor of the plaintiffs on the issue of liability. A year and a half later, the district court awarded the plaintiffs over $37 million in damages and more than $9 million in prejudgment interest. AK Steel timely appealed. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    The AK Steel Plan

ERISA specifies that employee benefit plans are subject to "minimum standards . . . assuring the equitable character of such plans and their financial soundness." ERISA § 2(a), 29 U.S.C. § 1001. Under ERISA, a pension plan is either a defined contribution plan or a defined benefit plan. ERISA §§ 3(34), 3(35), 29 U.S.C. § 1002 (34), (35). A defined contribution plan "provide[s] for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account . . . ." ERISA § 3(34), 29 U.S.C. § 1002 (34). In other words, an employee's retirement benefit is the eventual value of his or her account to which contributions have been made by the employer and/or the employee.

Any other type of pension plan is a defined benefit plan. ERISA § 3(35), 29 U.S.C. § 1002(35). Under a defined benefit plan, an employee's benefit is an amount, either in the form of an annuity or a lump-sum payment, equal to a specified percentage of the employee's salary in the final years of his or her employment. The AK Steel Plan at issue in the present case is a hybrid of both a defined contribution plan and a defined benefit plan known as a "cash balance plan," but is classified under ERISA as a defined benefit plan.

"A cash balance plan is a defined benefit plan that possesses many of the characteristics of a defined contribution plan." Robert Rachal, Russell L. Hirschhorn & Nicole Eichberger, *Cases and Issues in Cash Balance Plan Litigation*, 22 Lab. Law. 19, 21 (2006). Cash balance plans mimic traditional defined benefit plans in that participants do not typically make any contributions. *Id.* Like defined contribution plans, however, a cash balance plan creates an account for each participant. But unlike traditional defined contribution plans, the account is hypothetical and created only for recordkeeping purposes. *Id.*

The hypothetical account on paper looks much like a traditional 401(k) account. *Id.* at 22. "This account balance is made up of two components: (i) a pay credit (e.g., 3% of pay per year); and (ii) an interest credit on the account balance, which may be fixed or variable and tied to some index." *Id.* If these interest credits are tied to an average rate of return on investments in the stock market, for example, the employer bears any "investment risk" by agreeing to credit the participant's account at that market rate. Even if the employee ceases working for the plan sponsor, interest credits continue to accrue to the employee's hypothetical account until he or she begins receiving pension benefits. When an employee reaches the normal retirement age of 65, the pension benefit is the value of this hypothetical account balance. The employee can usually choose whether the benefit is distributed in the form of a single-life annuity or a lump-sum disbursement.

In the present case, the AK Steel Plan provides for two different types of cash balance accounts: Opening Accounts and Future Accounts. Opening Accounts represent the lump-sum value of the retirement annuity that an employee had earned under AK Steel's prior benefit formula as of January 1, 1995. The Opening Accounts grow at a minimum interest rate of 7.5% per year. Future Accounts keep track of benefits earned after January 1, 1995, the date on which AK Steel

converted its previous traditional pension benefit plan to a cash balance plan. The Future Accounts receive pay credits at a rate of between 3% and 12% per year, calculated according to a chart that factors in both the participant's age and continuous years of service as of December 31, 1994, multiplied by an applicable percentage of pay that is periodically set by AK Steel. For example, a Plan participant who was 39 years old on December 31, 1994 and had six continuous years of service as of that date would receive pay credits at the rate of 3% of earnings. A Plan participant who was 55 years old on that date, in contrast, with the same years of service, would receive pay credits at a rate of 5% of earnings. Interest credits on Future Accounts are tied to the rate of return on U.S. Treasury securities.

The AK Steel Plan provides that

> [s]ubject to the minimum protected benefits described in Section 4.8, a Participant may Retire on or after his Normal Retirement Date and receive a . . . Benefit payable in accordance with Article VI in one of the following payment options: (a) Full lump-sum payable on his Benefit Commencement Date equal to his Accounts; (b) Full annuity beginning on his Benefit Commencement Date equal to the Actuarial Equivalent of his Accounts; or (c) Partial lump-sum and partial annuity payable or beginning on his Benefit Commencement Date equal to the respective pro-rata amounts determined under (a) and (b) above.

AK Steel Plan § 4.1. A participant who takes early retirement, subject to certain conditions not relevant to this appeal, may also elect to receive his or her pension benefit in any of the above-mentioned payment options. AK Steel Plan § 4.2.

Section 4.8 of the AK Steel Plan, titled "Minimum Protected Benefit," states that "no Participant shall have a . . . benefit that is less than the actuarial equivalent of his accrued benefit determined under the terms of the [prior plan]. . . ." "Accrued Benefit" is defined by the Plan as

> the Accounts payable in the form of a single life annuity commencing on a Participant's Normal Retirement Date (or, if later, such Participant's actual retirement date) that is the Actuarial Equivalent of the Participant's current Account. The Account is projected to Normal Retirement Date and converted to a single life annuity using the factors set forth in Exhibit I. This single life annuity shall be determined by dividing the then current value of such Participant's Account by the applicable factor as described in Section A of Exhibit I.

Another key provision of the AK Steel Plan is § 1.2, which tracks the language of ERISA. Section 1.2 defines a participant's accrued benefit under a defined benefit plan as an "individual's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

The Internal Revenue Service (IRS) issued a determination letter in November of 1996 that approved the AK Steel Plan. As part of its application, the AK Steel Plan expressly stated that an employee electing a lump-sum distribution of benefits would receive a payment equal to his or her account balance.

No. 06-3442          *West v. AK Steel Corporation et al.*                    Page 4

**B.     Whipsaw calculation**

The most litigated aspect of cash balance plans has proven to be the so-called "whipsaw calculation." This calculation arises when participants opt to "cash out" their hypothetical accounts before they reach normal retirement age. To comply with ERISA, lump-sum payments such as the ones received by the plaintiffs in the present case must be the actuarial equivalent of the normal accrued pension benefit. *See Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003) (citing 29 U.S.C. § 1054(c)(3)). The actuarial equivalent is calculated in two steps. First, a participant's hypothetical account balance is projected forward to normal retirement age—in the AK Steel Plan, age 65—using the rate at which future interest credits would have accrued if the participant had remained in the AK Steel Plan until that time. Second, that projected amount is discounted back to its present value on the date of the actual lump-sum distribution.

If the interest rate used in Step 1 is greater than the discount rate used in Step 2, the amount of the participant's lump-sum disbursement will be larger than his or her hypothetical account balance. This two-step process is commonly referred to as the "whipsaw calculation." In the present case, Opening Accounts receive interest credits at a minimum annual rate of 7.5%, while the statutory discount rate for calculating the present value of a lump-sum distribution has been invariably lower (5.1% in 2002, for example). This causes the value of the pension benefit under the whipsaw calculation to be greater than the simple value of the account balance at the time of the lump-sum distribution. The IRS provides a useful example of the whipsaw effect:

> A cash balance plan provides for interest credits at a fixed rate of 8% per annum that are not conditioned on continued employment, and for annuity conversions using the [Internal Revenue Code §] 417(e) applicable interest rate and mortality table. A fully vested employee with a hypothetical account balance of $45,000 terminates employment at age 45 and elects an immediate single sum distribution. At the time of the employee's termination, the Section 417(e) applicable interest rate is 6.5%.
>
> The projected balance of the employee's hypothetical account as of normal retirement age is $209,743. If $209,743 is discounted to age 45 at 6.5% (the Section 417(e) applicable interest rate), the present value equals $59,524.
>
> Accordingly, if the plan paid the hypothetical account balance of $45,000, instead of $59,524, the employee would receive $14,524 less than the amount to which the employee is entitled.

IRS Notice 96-8, 1996-1 C.B. 359.

The plaintiffs argue that ERISA mandates the whipsaw calculation—in other words, a payout of $59,524 in the example cited above—and that AK Steel's failure to calculate lump-sum distributions in this manner constitutes a statutory violation of ERISA. AK Steel responds by arguing that, under the plain language of the AK Steel Plan, the plaintiffs received exactly the lump-sum distribution to which they were entitled—the value of each participant's hypothetical account at the date of termination ($45,000 in the example above).

**C.     Pension Protection Act of 2006**

Cash balance plans are typically designed to pay accrued benefits to participants upon the termination of their employment. *Rachal, Hirschhorn & Eichberger*, 22 Lab. Law. at 27. "ERISA,

however, was not designed with cash balance plans in mind and, instead, is premised on the notion that in a defined benefit plan, the benefit due is an annuity beginning at the normal retirement age, typically age sixty-five." *Id.* Until August of 2006, ERISA enforced this annuity obligation through several interrelated provisions. *Id.* at 20, 27. The net result of this enforcement scheme was that a cash balance plan such as the AK Steel Plan would be required to use the whipsaw calculation in order to comply with ERISA. *See id.* at 27.

Partly to address the treatment of cash balance plans under the ERISA statutory scheme, Congress passed the Pension Protection Act (PPA) of 2006. Pub. L. No. 109-280, 120 Stat. 780 (2006). The PPA created special rules for cash balance plans, among them the provision that defined benefit plans shall not be treated as failing to meet the requirements of ERISA solely because the present value of an accrued benefit is deemed equal to the amount expressed as the balance in a participant's hypothetical account. PPA § 701(a)(2). These rules apply to distributions made after August 17, 2006. PPA § 701(e)(2). In effect, the PPA establishes on a prospective basis that the whipsaw calculation is not required.

### D.    Procedural history

John West was employed by Armco, Inc. from October 1966 until his retirement from the company in August of 1997 at the age of 57. He was a participant in the Armco, Inc. Retirement Accumulation Pension Plan, a part of the Armco, Inc. Noncontributory Pension Plan. Upon taking early retirement, West elected to receive his pension benefits in a lump-sum distribution. He signed a benefit-election form acknowledging that he understood his payment options, and that he was making a fully informed decision to receive his benefits in the form of a lump-sum distribution equal to his account balance. In September of 1999, Armco, Inc. merged with AK Steel. The original Armco retirement plan, in which West was a participant, became part of the AK Steel Plan.

West submitted an administrative claim to the AK Steel Plan administrators in September of 2000 that challenged the amount of his lump-sum benefit. He argued that the lump-sum benefit he received was not the actuarial equivalent of the benefit that he would have been entitled to at age 65 because it did not account for the interest credits that would have continued to accumulate under the terms of the AK Steel Plan if he had waited until the age of 65 to collect his benefits. The AK Steel Plan Committee rejected his administrative claim as untimely and, with regard to the merits, ruled that West had received all of the benefits due to him under the terms of the AK Steel Plan.

In January of 2002, West filed suit on behalf of himself and all others similarly situated, claiming that this alleged underpayment of benefits violated ERISA. The district court certified the class in March of 2004. A month later, the district court granted West's motion for partial summary judgment on the issue of liability. After denying a subsequent motion by AK Steel to dismiss West's claim as time-barred, the district court awarded damages of over $37 million to the class together with prejudgment interest. AK Steel timely appealed.

## II. ANALYSIS

### A.    Standard of review

We review the district court's grant of summary judgment under the de novo standard. *Tatis v. U.S. Bancorp*, 473 F.3d 672, 674 (6th Cir. 2007). That same standard applies to our review of the district court's interpretation of a statute. *United States v. Tudeme*, 457 F.3d 577, 580 (6th Cir. 2006). The district court's decision of whether to apply the Plan requirement that ERISA plaintiffs must exhaust their administrative remedies before filing suit in federal court is reviewed under the abuse-of-discretion standard. *Costantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994).

**B.      Jurisdiction under ERISA to grant the relief requested**

Section 502(a)(1)(B) of ERISA authorizes a participant or beneficiary of a benefit plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA § 502(a)(3), on the other hand, authorizes a participant, beneficiary, or fiduciary of a benefit plan to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations, or (ii) to enforce any provisions of this subchapter or the terms of the plan."

West's complaint tracks the language of both § 502(a)(1)(B) and § 502(a)(3):

> This is a class action to enforce, and to redress violations of [ERISA]. The action is brought on behalf of participants in an ERISA-qualified pension plan to recover benefits due them under the terms of the plan, to enforce their rights under the terms of the plan, to clarify their rights to future benefits under the terms of the plan, and to redress violations of ERISA.

The prayer for relief requests damages to remedy the alleged underpayment of benefits due to how the lump-sum distribution was calculated under the AK Steel Plan. AK Steel argues that neither prong of the ERISA enforcement scheme authorizes the relief that the plaintiffs seek. We will analyze the two statutory provisions in reverse order.

*1.      Equitable relief under § 502(a)(3)*

AK Steel argues, and we agree, that the plaintiffs cannot recover the relief they request under ERISA § 502(a)(3). Any doubt on this point was eliminated by this court's decision in *Crosby v. Bowater, Inc. Ret. Plan*, 382 F.3d 587 (6th Cir. 2004). The plaintiff in *Crosby*, a retirement plan participant, argued that the plan administrator's use of a preretirement mortality discount factor in the whipsaw calculation of lump-sum preretirement benefits constituted a statutory violation of ERISA. *Id.* at 589. As a result, Crosby alleged that he and similarly situated plan participants were paid a benefit that fell short of the amount that they were legally entitled to receive. *Id.* "At the heart of the plaintiff's prayer for relief was a request for recovery of additional lump sum benefits." *Id.* The complaint requested "equitable and injunctive relief." *Id.* Unlike in the present case, however, Crosby specifically argued that he was precluded from bringing a claim under § 502(a)(1)(B). *Id.* at 591 n.5. The court "intimate[d] no view as to whether [that] proposition is correct." *Id.*

Crosby argued that the relief he requested was an appropriate equitable remedy because he did not seek to impose liability for a contractual monetary obligation. *Id.* at 592-93. This court, in rejecting his argument, began its analysis by noting that the Supreme Court has held that equitable relief refers to the categories of relief traditionally available in a court of equity—namely, injunction, mandamus, and restitution, but not compensatory damages. *Id.* at 594. Lawsuits seeking to compel the defendant to pay a sum of money, on the other hand, almost invariably are suits for money damages, the classic form of legal relief. *Id.* at 594. The court therefore held that ERISA § 502(a)(3) "does not, in most situations, authorize an action for money claimed to be due and owing." *Id.* at 589.

Unlike *Crosby*, the plaintiffs in the present case expressly brought their claims under both § 502(a)(3) *and* § 502(a)(1)(B). The prayer for relief, however, centers on money damages for the alleged underpayment of a benefit. Although the plaintiffs also request unspecified "other relief as may be deemed just and equitable," that phrase is found in the portion of the complaint requesting costs and attorney fees. This is insufficient to assert a proper equitable claim under § 502(a)(3)

where the "heart of the plaintiff's prayer for relief was a request for recovery of additional lump sum benefits." *Crosby*, 382 F.3d at 589.

The plaintiffs in the present case have already "cashed out" of their participation in the Plan, so traditional forms of equitable relief—injunction, mandamus, or restitution—would not redress their claim. Because the plaintiffs' claim in the present case is essentially one for money damages, we conclude that *Crosby* forecloses their claim to the extent that they rely on § 502(a)(3). *See id.* at 589 ("For the district court to order the defendants "to refund" (*i.e.* to pay) the difference between the amount calculated without a mortality discount and the amount actually received was to grant a form of relief not typically available in equity."); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) ("[S]uits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.") (citation and quotation marks omitted).

### 2.    *Damages under § 502(a)(1)(B)*

West received his lump-sum payment in August of 1997. At that time, he executed a benefit-election form acknowledging that he understood his options and that he was making a fully informed choice of a lump-sum payment equal to his hypothetical account balance. He did not submit an administrative claim disputing the amount of the lump-sum payment until September of 2000. That claim was dismissed as untimely. Section 2.15(f) of the AK Steel Plan states that any claim questioning the amount of the benefit will be rejected unless it is filed within 90 days from the date of the first payment, subject to a showing of extenuating circumstances for the failure to timely file. Moreover, that section specifies that a "claimant who does not submit a written claim or request for review within the time limitations specified above shall be deemed to have waived and abandoned any such claim or right of review except with[] the express written approval of and in the discretion of the Committee."

AK Steel moved for the entry of judgment on West's claim, arguing that the claim had been untimely filed. The motion was not based on the theory that the statute of limitations on West's right to bring suit had expired, but rather that he had failed to seek timely administrative review as specified by the Plan. Concluding that West had not waived his legal claim under ERISA and that he was not required to first exhaust his administrative remedies, the district court denied the motion. The court concluded that resort to the administrative process would have been futile because the AK Steel Committee would have simply recalculated the benefits under the method outlined in the AK Steel Plan, resulting in the same benefit amount. It found that West's futility argument is based on his position that the provisions of the AK Steel Plan violate ERISA and the Internal Revenue Code and that no amount of administrative review would alter the calculation of benefits under the current terms of the plan.

On appeal, AK Steel argues that West cannot proceed under § 502(a)(1)(B) because he has already received all of the benefits he was due under the terms of the plan. It contends that he is now barred from bringing his damage claim for a statutory violation of ERISA because West had to "concede" that he received all of the benefits due him under the terms of the Plan in order to successfully argue that he came within the futility exception to ERISA's exhaustion requirement.

We respectfully disagree. To rule in favor of AK Steel on this ground would present future plaintiffs who would otherwise qualify for the futility exception to the exhaustion requirement with an untenable dilemma—having to concede their claim on the merits in order to survive a motion to dismiss for failure to exhaust administrative remedies. AK Steel, in our view, oversimplifies West's argument in an attempt to strip him of any remedy for the alleged violation of ERISA. As the district court aptly stated:

> Here, Plaintiffs contend that they are entitled to additional lump sum benefits under the terms of the Plan, because the Plan's treatment of lump sum payments violates ERISA. To accept Defendant's argument that Plaintiffs cannot bring any claim, would in effect permit plan terms that blatantly violate ERISA to stand unchallenged, because once the benefits were paid, participants could not bring a claim under § 502(a)(1)(B) for benefits "under the terms of the plan."

Exhaustion here would have been futile because, under the AK Steel Plan, a lump-sum distribution is described as a payment equal to the participant's account balance. Had West submitted a timely claim for the recalculation of his lump-sum benefit, the AK Steel Committee would simply have responded, as it has argued in this appeal, that West has already received an amount equal to his account balances, which is all that he is entitled to under AK Steel's interpretation of its Plan. The district court thus did not abuse its discretion in concluding that the exhaustion requirement does not apply in this case. *See Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 420 (6th Cir. 1998) ("[W]hen resort to the administrative review process would be an exercise in futility, the exhaustion of remedies doctrine shall not apply.").

Although AK Steel has a point that § 502(a)(1)(B) offers redress only for the recovery of benefits, enforcement of rights, or clarification of rights to future benefits under the terms of the Plan, those terms must nevertheless comply with ERISA. As will be discussed in greater detail below, the key issue is whether West was paid less than the full accrued benefit due him under the AK Steel Plan because of his election to receive that accrued benefit as a lump sum rather than as a traditional annuity. AK Steel concedes that the accrued benefit cannot be forfeited due to the form of distribution without violating ERISA.

Our conclusion that ERISA § 502(a)(1)(B) provides an appropriate remedy is bolstered by other cases in which plaintiffs have been allowed to proceed on similar claims. *See Esden v. Bank of Boston*, 229 F.3d 154, 161-62 (2d Cir. 2000) (allowing a class action under ERISA § 502(a)(1)(B) for unpaid benefits in a cash balance plan where the plan specified that lump-sum payments were equal to the amount in the participant's hypothetical account); *Laurent v. PriceWaterhouseCoopers LLP*, 448 F. Supp. 2d 537, 540 (S.D.N.Y. 2006) (denying the plan sponsor's motion to dismiss the plaintiffs' claim that the cash balance plan's provision for calculating lump-sum benefits violated ERISA because the balance payable under the terms of the plan was an amount less than the actuarial value of the accrued benefits); *see also Met. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (describing ERISA § 502(a)(1)(B) as the "exclusive federal cause of action" for recovering benefits from a covered plan).

## C.   Whipsaw calculation and ERISA compliance

AK Steel argues that neither ERISA nor the Internal Revenue Code (IRC) require the whipsaw calculation adopted by the district court. The district court held that, in order to calculate a participant's lump-sum payment, the participant's hypothetical account balance must be (1) projected forward at AK Steel Plan's specified interest rates into a life annuity beginning at age 65, and then (2) discounted back at the lower statutory rates (prescribed by ERISA and the IRC) to a lump-sum present value. AK Steel argues that it is entitled to use the same statutory rate for both steps of the calculation. If so, the calculation would be a wash and the lump-sum payout would always equal the participant's hypothetical account balance at the time of distribution.

### *1.    Prior caselaw dealing with the whipsaw calculation and cash balance plans*

Three other circuits have addressed the issue of whether the whipsaw calculation is required for a lump-sum payout from a cash balance plan where a participant can retire prior to normal retirement age. These three cases are as follows:

#### *a.    Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*

In *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235 (11th Cir. 2000), a plan participant could elect to receive his or her "accrued pension benefits in an optional lump sum form, payable immediately, rather than as an annuity commencing at age 65." *Id.* at 1238. "If the participant elects this option, the amount payable under the Plan is a single sum equal to the amount in the participant's Personal Account (the hypothetical bookkeeping account)." *Id.* at 1238-39. Just like West in the present case, Lyons sued for the underpayment of benefits, alleging that the amount Georgia-Pacific distributed to him was substantially less than what he was entitled to receive under ERISA § 203(e), as interpreted by Treas. Reg. 1.411(a)-11 (which "restricts the ability of defined benefit plans to distribute any portion of a participant's accrued benefit in optional forms of benefit without complying with specific valuation rules for determining the amount of the distribution") and Treas. Reg. 1.417(e)-1(which requires a minimum lump sum payable from a defined benefit plan to be at least equal to the present value of the participant's normal retirement benefit). *Id.* at 1239. The annual amount of interest added to Lyon's hypothetical account as specified in the Georgia-Pacific Plan (used in Step 1 of the whipsaw calculation) was higher than the maximum discount rate (used in Step 2 of the whipsaw calculation to determine the present value of the projected age-65 annuity) prescribed by ERISA § 203(e). *Id.* at 1241.

Agreeing with Lyons, the Eleventh Circuit held that he should benefit from the whipsaw calculation. The *Lyons* court succinctly stated the issue: "If the plan had pegged the interest credit rate to the prescribed maximum discount rate, there would have been no difference (regardless of the time factor), and no dispute. But it did not, so there is a dispute." *Id.* at 1241.

Treas. Reg. 1.411(a)-11, which sets forth the same discount restrictions on calculating the present value of lump-sum distributions as ERISA § 203(e), specifies "that the present value of any optional form of benefit (a lump sum payout is an optional form of benefit), cannot be less than the present value of the participant's normal retirement benefit." *Id.* at 1244. The *Lyons* court held that, "[u]nlike a defined contribution plan, the accrued benefit under this Plan is not the amount in the Participant's Personal Account, but rather an amount *derived from* that hypothetical account." *Id.* at 1251 (emphasis in original). In contrast to the AK Steel Plan, the Georgia-Pacific Plan itself required the whipsaw calculation:

> To determine the normal retirement amount Lyons would have received at age 65, the Plan specifies that his hypothetical account balance must be projected forward using the interest credit rates set forth in the Plan. It is the Plan itself, rather than the Treasury regulations, that requires the hypothetical account balance to be projected forward using the credit interest rate, and it is the Plan itself that specifies the interest credit rate to be applied for that purpose. What the Treasury regulation adds is that once the normal retirement benefit is ascertained in accordance with the Plan, that amount is then to be discounted to present value using the [Pension Benefit Guaranty Corporation (PBGC)] rate [prescribed by ERISA § 203] in order to calculate the lump sum distribution to which the participant is entitled.

. . .

> Distribution of the hypothetical account balance alone is not enough
> where, as here, the interest credit rate exceeds the [PBGC] rate.

*Id.* at 1252.

### b.    *Esden v. Bank of Boston*

The Bank of Boston amended its plan in 1989 to become a cash balance plan. *Esden v. Bank of Boston*, 229 F.3d 154, 159 (2d Cir. 2000). Like the present case, the Bank of Boston Plan provided that whenever a participant elected a lump-sum distribution, the benefit received would be equal to the balance of the participant's hypothetical account. *Id.* at 161. Esden elected to take a lump-sum benefit at the time she terminated her employment in the amount of $1,533.98. *Id.* at 160. This was the balance in her hypothetical account at that time. *Id.* Had Esden waited until the age of 65 to cash out her plan, she would have been entitled under the terms of the Plan to a minimum accrued benefit of $7,086.83—the projected lump-sum amount of her account at age 65, assuming a minimum guaranteed interest credit of 5.5%. *Id.* at 160-61. At the time of her termination, that projected age-65 annuity benefit had a present value of $1,595.52 (slightly more than what she received). *Id.* at 161. Esden argued that she received less than what the law requires under ERISA. *Id.* at 162.

The Bank of Boston contended, as does AK Steel in the present case, that Esden received all that she was promised under the explicit terms of the plan, and that any additional payout would constitute a windfall at the expense of the other Plan participants. *Id.* Agreeing with Esden, the Second Circuit concluded that the "Plan does not comply with the statutory and regulatory requirements, or with their authoritative interpretation issued by the IRS." *Id.* at 162. Moreover, it concluded, "the IRS's interpretation of how the existing regulations apply to cash balance plans is reasonable and consistent." *Id.* The court summarized the relevant ERISA and IRC requirements for pension distribution in less-technical language:

> What these provisions mean . . . is that: (1) the accrued benefit under
> a defined benefit plan must be valued in terms of the annuity that it
> will yield at normal retirement age; and (2) if the benefit is paid at any
> other time (*e.g.*, on termination rather than retirement) or in any other
> form (*e.g.*, a lump sum distribution, instead of annuity) *it must be
> worth at least as much as that annuity.*
>
> This rule that regardless of any option as to timing or form of
> distribution, a vested participant in a defined benefit plan must
> receive a benefit that is the actuarial equivalent of her normal
> retirement benefit (that is, the accrued benefit expressed as an annuity
> beginning at normal retirement age) has been repeatedly recognized
> by courts.

*Id.* at 163 (emphasis added) (citations omitted).

The court in *Esden* concluded that the Bank of Boston could not use the same rate in both Step 1 and Step 2 of the whipsaw calculation without working an impermissible forfeiture in violation of ERISA. *Id.* at 165-66 ("Either the plan must have employed a discount rate equal to the interest credit rate, and by hypothesis in excess of the prescribed 'applicable rate,' in violation of Code section 417(e) and ERISA section 205(g); or the plan must have projected the cash account balance forward at a rate less than the interest credits provided under the plan, thereby working a

forfeiture under Code section 411(a)(2) and ERISA § 203(a)(2).") (relying on IRS Notice 96-8). The fact that Esden received exactly what she was promised under the terms of the plan was deemed irrelevant because the "issue is whether the Plan's terms complied with the law." *Id.* at 172. As the court observed, "[t]he Plan cannot contract around the statute." *Id.* at 173.

### c.    *Berger v. Xerox Corp. Retirement Income Guarantee Plan*

In 2003, the Seventh Circuit affirmed a $300 million class action judgment against Xerox for underpayments made to participants in its cash balance pension plan who elected to take a lump-sum payout upon termination of employment. *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 757-58 (7th Cir. 2003). Xerox's plan entitled the "departing employee not to the balance in his (hypothetical) account, but to the balance when he receives the 'distribution' of his pension benefit." *Id.* at 758-59. The Xerox Plan computed lump-sum distributions paid out before normal retirement age under the whipsaw calculation, but because it used identical interest rates in both steps of the calculation, the result always equaled the participant's cash balance on the date of his or her departure. *Id.* at 760.

What Xerox did is exactly what AK Steel argues is the proper approach in the present case. But just as in *Lyons*, *Esden*, and the present case, the interest credit rate specified in the Xerox Plan was higher than the statutory discount rate. *See id.* The whipsaw-calculation issue was thus squarely before the *Berger* court.

ERISA, said the court, mandates that any lump-sum substitute for an accrued pension benefit must be the actuarial equivalent of that benefit. *Id.* at 759 (citing 29 U.S.C. § 1054(c)(3)). The Seventh Circuit held that future interest credits are part of a participant's accrued benefit. *Id.* A participant in the Xerox Plan had an "absolute, vested, indefeasible entitlement . . . to a pension at age 65 based on his cash balance as increased by future interest credits accruing between his departure and his reaching that age, provided only and obviously that he does not demand an earlier distribution." *Id.* Because that pension entitlement is an accrued benefit under the plan, any lump-sum distribution occurring before the participant reaches the age of 65 "has to include a fair estimate of those [interest] credits." *Id.* Xerox was, in short, inviting participants "to sell their pension entitlement back to the company cheap, and that is a sale that ERISA prohibits." *Id.* at 762.

### 2.    *Value of accrued benefit in the AK Steel Plan*

AK Steel argues that it is allowed under ERISA to use the same statutory rate at both steps of the whipsaw calculation because the Plan does not provide an accrued benefit "in the form of an annual benefit commencing at normal retirement age" as specified in Treas. Reg. § 1.411(a)-7(a)(1)(i). It argues that because West received a lump-sum distribution, his accrued benefit was provided in a different form and is therefore governed by subsection (ii) of that regulation. Under that subsection, the accrued benefit is "an annual benefit commencing at normal retirement age which is the actuarial equivalent" of the accrued benefit determined under the plan. Treas. Reg. § 1.411(a)-7(a)(1)(ii). If AK Steel can fit its definition of accrued benefit within that subsection, so the argument goes, then it can use the same actuarial equivalence factors under IRC § 411(c)(3) both to project forward the age-65 annuity and to discount the annuity to present value. The result would always equal the participant's account balance at the time of the lump-sum payout.

We respectfully disagree.  The AK Steel Plan expressly states in § 1.2 that the

> "Accrued Benefit" is the "Accounts payable in the form of a single life annuity commencing on a Participant's Normal Retirement Date (or, if later, such Participant's actual retirement date) that is the Actuarial Equivalent of the Participant's current Account.

A benefit paid at any other time or in another form "must be worth at least as much as that annuity. *Esden*, 229 F.3d at 163.  AK Steel equates the lump-sum payment option it offers to participants as an accrued benefit "to be determined as an amount other than an annual benefit commencing at normal retirement age," which under its theory would entitle it to make the whipsaw calculation a complete wash.  *See* IRC § 411(c)(3).

The definition of what constitutes an accrued benefit under the terms of the Plan, however, is clear—the annual benefit commencing at normal retirement age.  AK Steel Plan § 1.2.  To the extent that the Plan's language with respect to lump-sum distributions is ambiguous in that it conflicts with the definition of "accrued benefit" in another section of the Plan, the ambiguity must be resolved in the plaintiffs' favor.  *See Regents of Univ. of Mich. v. Employees of Agency Rent-A-Car Hosp. Ass'n,* 122 F.3d 336, 340 (6th Cir. 1997) ("[A]ny ambiguities in the language of the [ERISA] plan [are to] be construed strictly against the drafter of the plan.").

We believe that the facts of the present case on this particular point are indistinguishable from *Esden* and *Berger*.  Had West elected not to cash out of the AK Steel Plan by taking the lump-sum distribution prior to reaching the age of 65, he would have continued to receive interest credits on his Opening and Future Accounts under the Plan.  Those interest credits were not taken into account by the Plan when disbursing a lump-sum payout "equal to his Accounts" before West reached the age of 65.  AK Steel Plan § 4.1.  The Plan's terms thus did not comply with the law.  *See Esden*, 229 F.3d at 172.  What happened here is exactly what happened in *Berger*—West was required to "sell" his pension entitlement back to AK Steel at a discount in order to receive his lump-sum payout.  *See Berger*, 338 F.3d at 762.  AK Steel's requirement thus violates ERISA.

"Any distribution in optional form (such as a lump sum) must be no less than the actuarial equivalent of [the normal retirement] benefit."  *Esden*, 229 F.3d at 159.  And as discussed above, the normal retirement benefit is "a single-life annuity payable at normal retirement age."  *Id.*; *see also* AK Steel Plan § 1.2.  AK Steel's complicated interpretations of the relevant statutes and regulations do not, in our view, refute these basic legal principles.

But AK Steel argues that affirming the district court's requirement that the Plan base early lump-sum payouts on the whipsaw calculation will lead to unintended and catastrophic results.  It also claims that affirming the district court's ruling somehow amounts to age discrimination.  We find neither of these arguments to be persuasive.  First of all, the whipsaw calculation may have an unintended effect on this particular Plan, but that is not the issue here.  As the *Esden* court noted: "[i]t is undisputed that the governing statutes and regulations were developed with traditional final-pay defined benefit plans in mind; they do not always fit in a clear fashion with cash balance plans and they sometimes require outcomes that are in tension with the objectives of those plans."  *Esden*, 229 F.3d at 159.  The Plan is nonetheless required to comply with ERISA.  As explained above, we conclude that it did not do so in this case.  Second, what may appear at first blush to be age discrimination is really nothing more than the time value of money.  *See Cooper v. IBM Personal Pension Plan*, 457 F.3d 636, 639 (7th Cir. 2006) ("Treating the time value of money as a form of discrimination is not sensible.").

AK Steel attempts to undercut the persuasive force of *Esden* and *Berger* "because both decisions upheld whipsaw claims on the basis of deference to [Treasury] Notice 96-8." It argues that

both the Second Circuit and the Seventh Circuit unknowingly deferred to a Notice that the IRS is "fundamentally reconsidering." This argument misconstrues, in our view, the nature of those holdings. AK Steel is correct in that both decisions discussed Notice 96-8 in some detail and cited it as support for their conclusions that the whipsaw calculation was required. *See Esden,* 229 F.3d at 169 (holding that the Notice is "entitled to deference, regardless of its form of publication"); *Berger,* 338 F.3d at 762 (describing Notice 96-8 as "authoritative").

But the court in *Esden* specifically stated that "even if we were to disregard Notice 96-8, we would reach the same result, as explained above, on the basis of the governing statutes and regulations." 229 F.3d at 172; *accord Berger,* 338 F.3d at 763 ("We conclude, in agreement with the Second Circuit which considered a materially identical plan in the *Esden* case, that the Xerox plan's method of computing the plaintiffs' lump-sum entitlements violates ERISA.").

In sum, we agree with the analysis of our sister circuits and with that of the district court below. Each plaintiff is entitled to have his or her lump-sum distribution reevaluated using the whipsaw calculation as determined by the district court, plus interest.

**D.      Preretirement mortality discount**

AK Steel next argues that even if a whipsaw calculation is required under ERISA, the district court erred in holding that the Plan may not use a preretirement mortality discount in performing that calculation. The mortality discount, according to the district court, "factors into the present value of a future benefit the possibility that a participant might die before receiving that benefit, and thus receive nothing." Relying on *Berger v. Xerox,* 231 F. Supp. 2d 804 (N.D. Ill. 2002) (*Berger I*), and *Crosby v. Bowater,* 212 F.R.D. 350 (W.D. Mich. 2002), *vacated and remanded on other grounds, Crosby v. Bowater,* 382 F.3d 587 (6th Cir. 2004), the district court concluded that a preretirement mortality discount "should not be applied to the present value calculation because it would reduce a participant's 'accrued benefit' of the interest credit rate projection."

The issue, according to the district court, is whether ERISA's actuarial-equivalence rules forbid the use of a mortality discount. It reasoned that the central premise underlying the whipsaw calculation is "that a participant's benefit should not be reduced by electing to receive a lump sum instead of waiting to receive an annuity." Because the AK Steel Plan did not contemplate using the whipsaw calculation at all, the Plan does not address whether a mortality discount applies.

If a Plan participant dies before reaching the age of 65, the Plan's terms provide that the surviving spouse or other beneficiary receives a death benefit "equal to the participant's pension benefit." Section 5.1 of the AK Steel Plan defines the death benefit for an unmarried participant as the greater of (1) a lump sum equal to the participant's account at the time of death, or (2) the actuarial equivalent of the participant's minimum protected benefit as defined by § 4.8. The minimum protected benefit under § 4.8 is the actuarial equivalent of the participant's accrued benefit. And, as stated above, the accrued benefit is defined as the "Accounts payable in the form of a single life annuity commencing on a Participant's Normal Retirement Date . . . that is the Actuarial Equivalent of the Participant's current Account." AK Steel Plan § 1.2. Because the beneficiary receives a death benefit equal to the participant's accrued benefit, he or she "steps into [the participant's] shoes and is entitled to his entire pension benefit." *See Berger II,* 338 F.3d at 764 (rejecting the Plan's argument that a preretirement mortality discount properly applied to the calculation of damages in whipsaw claims materially indistinguishable from the present case).

AK Steel argues, however, that *Berger I* and *Crosby* were both incorrectly decided, so that any reliance by the district court on those cases is misplaced. We respectfully disagree, and find that the reasons given by the *Berger I* court (and relied upon by the district court) for rejecting the use of a preretirement mortality discount to be well-supported. Even if the participant were to die before

the age of 65, his or her beneficiary is still entitled to the entire accrued benefit. AK Steel Plan § 1.2. "Use of a mortality discount for the period before age sixty-five would, accordingly, result in a partial forfeiture of benefits in violation of the ERISA vesting rules (i.e., the anti-forfeiture rules)." *Berger I*, 231 F. Supp. 2d at 804. Using a mortality discount to reduce the present value of the lump-sum distribution in the present case would also have the effect of reducing the value of the interest credits, as the district court pointed out. This would create the same impermissible forfeiture under ERISA as described in Part II.C. above.

### E.    Pension Protection Act of 2006

AK Steel's final challenge to the district court's decision relates to the PPA, which the President signed into law on August 17, 2006. This law resolves the whipsaw controversy for the future by amending ERISA and the IRC to explicitly state that cash balance plans are not required to employ the whipsaw calculation when figuring lump-sum distributions. Section 701(a)(2) amends ERISA § 203 by adding special rules for defined benefit plans. One such rule is that these plans "shall not be treated as failing to meet . . . the requirements of [ERISA § 203(a)(2)], or . . . the requirements of section 204(c) or section 205(g) . . . solely because the present value of the accrued benefit (or any portion thereof) of any participant is, under the terms of the plan, equal to the amount expressed as the balance in the hypothetical account." PPA § 701(a)(2). Section 701(b)(2) similarly amends the IRC.

The PPA specifies that these amendments "shall apply to periods beginning on or after June 29, 2005," PPA § 701(e)(1), and that they "shall apply to distributions made after the date of the enactment of this Act," which was August 17, 2006. PPA § 701(e)(2). AK Steel argues that any monetary relief paid to West and the other class plaintiffs would be a "distribution" made after August 17, 2006, and therefore not required by the PPA.

We find this argument to be without merit. As West points out, the class is limited to vested participants in the AK Steel Plan "who retired or were terminated from employment on or after January 1, 1995 and who received their pension benefits under the Plan in the lump sum form of payment on or before April 1, 2005." Internal Revenue Service Notice 2007-6, which provides transitional guidance regarding the application of the PPA to cash balance plans, states that the amendments at issue here "are generally effective for periods beginning on or after June 29, 2005." Notice 2007-6, 2007-3 I.R.B. 272 (Jan. 16, 2007). Moreover, Section 701(d)(2) of the PPA provides that "[n]othing in the amendments made by this section shall be construed to create an inference with respect to . . . the determination of whether an applicable defined benefit plan fails to meet the requirements of sections 203(a)(2), 204(c), or 205(g) of [ERISA or the Code] solely because the present value of the accrued benefit (or any portion thereof) of any participant is, under the terms of the plan, equal to the amount expressed as the balance in a hypothetical account."

Questioning the correctness of the whipsaw calculation to the case before us based upon the enactment of the PPA would thus be improper. *Cf. O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) (holding that a section of the Small Business Job Protection Act of 1996 did not apply "[b]ecause it is of prospective application," and because "[t]he Conference Report on the new law says that 'no inference is intended' as to the proper interpretation of § 104(a)(2) prior to amendment") (citation and brackets omitted). The legislative history of the PPA also supports this conclusion. *See* 152 Cong. Rec. at S8762 (daily ed. Aug. 3, 2006) (quoting Senator Max Baucus, the ranking member of the PPA's reporting committee, as saying "We have dealt with the law going forward. *We intend no inference to what the rules were prior to enactment.* We will leave the past to the courts.") (emphasis added).

What is at stake here is a damages claim for AK Steel's past miscalculation of benefits. The monetary relief awarded by the district court is not a new "distribution" under a retirement plan as

contemplated by the PPA, but retrospective relief for a past violation of the law as it stood at the time of the distribution. *See, e.g., Lieske v. Morlock*, 570 F. Supp. 1426, 1430 (N.D. Ill. 1983) (denying the plan administrator's motion to dismiss the beneficiaries' ERISA claim as moot where the complaint "[did] not seek distribution of lump sum payouts but rather damages incurred by the plaintiffs as a result of defendants wrongfully denying the lump sum distributions").

Characterizing the damages award in the present case as a distribution subject to the parameters of the PPA would make the PPA effectively retroactive despite specific language in the statute to the contrary. We decline to do so here. Because of our conclusion that the PPA is not retroactive in application, it has no effect on the legal analysis of the present case.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.